LEWIS EDWARDS & others[1] vs. CITY OF BOSTON & another.[2]

Suffolk. September 5, 1990. - November 21, 1990.

Present: LIACOS, C.J., NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Practice, Civil,* Taxable inhabitants' action. *Injunction. Uniform Procurement Act. Contract,* Option. *Boston. Statute,* General law, Special law. *Municipal Corporations,* Contracts, Home rule. *Constitutional Law,* Home Rule Amendment.

In a taxable inhabitants' action under G. L. c. 40, § 53, a single justice of the Appeals Court properly granted the plaintiffs' request for preliminary injunctive relief against the city of Boston and its school committee, where the single justice was warranted in concluding that there was a likelihood of a statutory violation by the defendants which would adversely affect the public interest. [645-647]

An exercise by the city of Boston of an option contained in a contract that it had entered into before the effective date of G. L. c. 30B, the Uniform Procurement Act, was governed by the act and, where the city had neither solicited nor accepted bids before exercising the option, the city's conduct was not in conformity with the act's requirements. [647-648]

General Laws c. 30B, the Uniform Procurement Act, did not conflict with the antecedent special laws comprising Boston's city charter, either with respect to the mayor's power to dispense with advertising for bids on certain contracts or with respect to the duties of municipal department heads. [648-652]

General Laws c. 30B, the Uniform Procurement Act, as a law of general application, did not violate art. 89 of the Amendments to the Massachusetts Constitution (the Home Rule Amendment) by reason of any unique impact the act might have on the city of Boston. [652-653]

.

---

[1]Nine other taxable inhabitants of the city of Boston; the Inspector General and National School Bus Service, Inc., were allowed to intervene.

[2]The school committee of Boston.          ·

CIVIL ACTION commenced in the Superior Court Department on May 31, 1990.

A motion for a preliminary injunction was heard by *Guy Volterra*, J., and a petition for relief from the order denying that motion was heard in the Appeals Court by *Raya S. Dreben*, J.

The Supreme Judicial Court transferred the case on its own initiative.

*Harold J. Carroll* (*Joseph Mulligan*, Corporation Counsel, *Albert W. Wallis*, Assistant Corporation Counsel, *Stephen H. Clark*, Assistant Corporation Counsel & *Michael S. Giaimo* with him) for the city of Boston & another.

*Stephen E. Cotton*, Special Assistant Attorney General (*Janet R. Werkman*, Special Assistant Attorney General, with him) for the Inspector General, intervener.

*Paul L. Nevins* for Lewis Edwards & others.

*Philip R. Olenick*, for National School Bus Service, Inc., intervener.

NOLAN, J. This case requires us to determine whether the city of Boston is bound by the Uniform Procurement Act, G. L. c. 30B, and, if so, whether the exercise by the city of an option contained in a preexisting contract was consistent with that statute. We hold that the statute applies to the city and that the exercise of the option in question violated the statute. Accordingly we affirm the order of the single justice of the Appeals Court.

This dispute centers on the award of a contract to manage Boston's school transportation service for the 1990-1991 school year. The school committee of Boston and the city of Boston (collectively, city) entered into a contract with In-City Boston Management (ICBM) to provide school bus service for the 1989-1990 school year. That contract contained an option for an additional year exercisable by the city. On December 29, 1989, the Legislature enacted the Uniform Procurement Act, G. L. c. 30B, which provides that certain municipal contracts be awarded by advertised competitive bidding. That act took effect May 1, 1990. See St. 1989, c. 687. On May 8, 1990, the city decided to exercise its option

and extend the contract with ICBM through the 1990-1991
school year. The city did not solicit bids prior to the exercise
of the option, nor did it respond to inquiries made by several
potential bidders. On May 14, 1990, the city formally exer-
cised the option.

Shortly thereafter, ten taxpayers residing within Boston
brought this action under G. L. c. 40, § 53 (1988 ed.). The
complaint alleged that the exercise of the option by the city
violated the provisions of G. L. c. 30B. The Superior Court
judge denied the plaintiffs' request for preliminary injunctive
relief, ruling that there was an insufficient showing of irrepa-
rable injury to the plaintiffs, and that G. L. c. 30B did not
apply to the exercise of the option. The plaintiffs appealed
the denial of the preliminary injunctive relief to a single jus-
tice of the Appeals Court pursuant to G. L. c. 231, § 118,
second par. (1988 ed.).

The single justice entered a preliminary injunction di-
recting the city to comply with the provision of G. L. c. 30B.
The city filed a notice of appeal from the single justice's or-
der under G. L. c. 231, § 118, second par. This court trans-
ferred the appeal on its own motion.

The issues before us are (1) whether the single justice ap-
plied the proper standard in issuing the preliminary injunc-
tion; (2) whether G. L. c. 30B applies to the city, and (3)
whether the exercise of the option was consistent with G. L.
c. 30B.

The city argues initially that the single justice of the Ap-
peals Court did not apply the proper standard in issuing the
preliminary injunction. The plaintiffs (ten taxpayers)
brought this action under G. L. c. 40, § 53.[3] That statute

[3]General Laws c. 40, § 53 (1989 Supp.), provides that: "If a town, re-
gional school district, or a district as defined in section one A, or any of its
officers or agents are about to raise or expend money or incur obligations
purporting to bind said town, regional school district, or district for any
purpose or object or in any manner other than that for and in which such
town, regional school district, or district has the legal and constitutional
right and power to raise or expend money or incur obligations, the supreme
judicial or superior court may, upon petition of not less than ten taxable
inhabitants of the town, or not less than ten taxable inhabitants of any

explicitly authorizes the grant of preliminary relief: "[The court] may, before the final determination of the cause, restrain the unlawful exercise or abuse of such corporate power." G. L. c. 40, § 53. The city claims that the single justice did not find irreparable injury to the plaintiffs and did not properly balance the potential harm to the parties. We disagree.

Since being enacted in 1847, G. L. c. 40, § 53, has provided a vehicle whereby concerned taxpayers may enforce laws relating to the expenditure of their tax money by local officials. See *Richards* v. *Treasurer & Receiver Gen.,* 319 Mass. 672, 674-677 (1946) (recounting historical development of G. L. c. 40, § 53). The words of the statute and our cases interpreting it demonstrate that a violation of any law designed to prevent abuse of public funds is, by itself, sufficient harm to justify an injunction. See, e.g., *East Side Constr. Co.* v. *Adams*, 329 Mass. 347, 352 (1952), (quoting *In re Emigrant Indus. Sav. Bank*, 75 N.Y. 388, 386 [1878], "[t]he taxpayer has a right to insist that provisions intended for his security shall be observed, notwithstanding the fact that, in a particular case, he may have suffered no harm by reason of the neglect of the authorities to comply with them)." In cases brought under G. L. c. 40, § 53, the taxpayer plaintiffs act as private attorneys general, enforcing laws designed to protect the public interest.

In *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79 (1984), we held that "[w]hen the government acts to enforce a statute or make effective a declared policy of [the Legislature], the standard of public interest and not the requirements of private litigation measure the propriety and need for injunctive relief," *id.* at 89, quoting *United States* v. *D'Annolfo*, 474 F. Supp. 220, 222 (D. Mass. 1979). When a private

town in the regional school district, or not less than ten taxable inhabitants of that portion of a town which is in the district, determine the same in equity, and may, before the final determination of the cause, restrain the unlawful exercise or abuse of such corporate power." This provision applies to cities as well as towns. G. L. c. 40, § 1. *Litton Business Sys.* v. *Commissioner of Revenue*, 383 Mass. 619, 621 (1981).

party brings suit to enforce a spending statute under G. L. c. 40, § 53, the standard is the same. "Thus, before issuing the preliminary injunction, a judge is required to determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." *Id.* Further, where a statutory violation is alleged, "the judge who decides whether an injunction should issue needs to consider specifically whether there is a likelihood of statutory violations and how such statutory violations affect the public interest." *Id.*

Therefore, there was no need for the single justice to find irreparable injury before issuing the preliminary injunction. Merely finding a likely statutory violation which adversely affected the public interest was sufficient. The single justice found that G. L. c. 30B applies to the city of Boston and that the exercise of the option in question here violates that statute. If she was correct in her legal conclusions, and we hold that she was, then the preliminary injunction was properly issued.

Turning to the merits, the city argues that G. L. c. 30B does not apply to it because the statute conflicts with the city charter, and because the statute violates art. 89 of the Amendments to the Massachusetts Constitution, the Home Rule Amendment. In the alternative, the city argues that its exercise of the option was consistent with G. L. c. 30B. We address the latter contention first, for if the city complied with the statute there is no need to decide whether the statute applies to Boston.

The city points to § 12 (*e*) of G. L. c. 30B, which refers specifically to the exercise of options.[4] Although the exercise of the school transportation option arguably satisfied § 12 (*e*), that is not the only applicable part of G. L. c. 30B. Sec-

---

[4]General Laws c. 30B, § 12 (*e*) (1989 Supp.), states: "The governmental body shall not exercise an option for renewal, extension or purchase unless the procurement officer, after a reasonable investigation of costs and benefits, has determined in writing that the exercise of the option is more advantageous than alternative means of procuring comparable supplies or services."

tion 23 of St. 1989, c. 687, states: "Any . . . exercise of any option under any contract after the effective date of this act shall be subject to the provisions of [c. 30B]." The goal of this section is to treat the exercise of an option as an award of an original contract subject to *all* the provisions of c. 30B.

General Laws c. 30B, § 5, requires that contracts in excess of $10,000 be awarded on the basis of advertised, competitive bidding. The school transportation contract for the 1990-1991 school year is worth in excess of $25,000. The city neither solicited nor accepted bids for the 1990-1991 school bus service contract. The exercise of the option therefore was not in conformity with c. 30B.

The city puts forth two reasons why this court should exempt it from G. L. c. 30B. First, the city argues that the statute is incompatible with its charter, and that the charter should control. Second, the city asserts that, because of the unique impact G. L. c. 30B would have on Boston, the statute is violative of art. 89. We address these contentions in order.

1. *The charter.* The construction of General Laws which are in conflict with preexisting special laws requires a careful analysis of legislative intent. We will not lightly impute to the Legislature the intent to repeal an antecedent special law since "[i]t may happen that acts of special legislation may be made in regard to a place, growing out of its peculiar wants, condition, and circumstances." *Brown* v. *Lowell*, 8 Met. 172, 174 (1844). See *Emerson College* v. *Boston*, 393 Mass. 303, 307-309 (1984). We need not attempt to infer the legislative intent behind G. L. c. 30B, however, unless that statute is inconsistent with the special laws governing Boston.

The city points to two areas where G. L. c. 30B arguably conflicts with its charter. First, the city asserts that c. 30B interferes with the power of the mayor to waive the advertisement of various contracts required under the charter. Second, the city argues that the requirement of c. 30B that the lowest bidder be awarded the contract interferes with the expertise that various municipal department heads must pos-

sess under the charter. We believe that there is no irreconcilable conflict between the two laws on either score.

The city charter of Boston is a patchwork of special laws enacted over the years by the Legislature. The city points to St. 1909, c. 486, § 30, which requires public advertising of all contracts worth over $2,000, unless the mayor authorizes otherwise in writing.[5] General Laws c. 30B, § 5 (c)(5), requires that all municipal procurement contracts worth more than $10,000 be advertised.[6] There is no provision in c. 30B

---

[5]St. 1909, c. 486, § 30, as amended, provides: "Every officer or board in charge of a department in the city and every officer, board or official of the county of Suffolk having power to incur obligations on behalf of the county in cases where said obligations are to be paid for wholly from the treasury of the city, when authorized to erect a new building or to make structural changes in an existing building, shall make contracts therefor not exceeding five, each contract to be subject to the approval of the mayor; and when about to do any work or to make any purchase, the estimated cost of which alone, or in conjunction with other similar work or purchase which might properly be included in the same contract, amounts to or exceeds two thousand dollars, shall, unless the mayor gives written authority to do otherwise, invite proposals therefor by advertisements in the City Record. Such advertisements shall state the time and place for opening the proposals in answer to said advertisement, and shall reserve the right to the officer, board or official to reject any or all proposals. No authority to dispense with advertising shall be given by the mayor unless the said officer, board or official furnishes him with a signed statement which shall be published in the City Record giving in detail the reasons for not inviting bids by advertisement nor unless the Law Department has given its approval to such award."

[6]General Laws c. 30B, § 5 (c) (5) (1989 Supp.), states: "The notice shall . . . be published at least once, not less than two weeks prior to the time specified for the receipt of bids, in a newspaper of general circulation within the area served by the governmental body.

"For procurements in the amount of twenty-five thousand dollars or more, or such larger amount as may be established by the state secretary, the procurement officer shall also place the notice in any publication established by the state secretary for the advertisement of such procurements.

"The procurement officer may distribute copies of the notice to prospective bidders, and may compile and maintain lists of prospective bidders to which notices may be sent.

"A city or town which regularly publishes a periodical listing municipal contracting opportunities may apply to the state secretary for permission to utilize such periodical in lieu of advertising in a newspaper of general circulation. The state secretary, after notice and an opportunity for interested persons to present their views, may grant, renew, or revoke permis-

for waiver of such advertising. The mayor, therefore, under c. 30B, may not authorize nonsolicitation contracts worth more than $10,000. The city contends that this is a limitation on the power granted the mayor under the charter.

The city charter provision in question, however, does not, strictly speaking, grant the mayor power to authorize non-soliciation contracts; rather, the charter authorizes the mayor to waive the advertising requirements contained in St. 1909, c. 486, § 30. The power of the mayor to dispense with those advertising requirements remains. There is no basis for infer-ring from the charter a general mayoral power to authorize nonsolicitation contracts.

Before 1890, when the original version of this provision was enacted (St. 1890, c. 418, § 4), there was no require-ment of public solicitation of municipal contracts. The char-ter provision in question restricts rather than expands munic-ipal power; the provision for mayoral dispensation merely specifies preconditions under which previously unfettered au-thority may be exercised. Any additional restrictions which the Legislature chooses to impose on a State-wide basis do not conflict with the charter; they merely supplement it. Thus, St. 1909, c. 486, § 30, can peaceably coexist with G. L. c. 30B, § 5(c).[7]

sion for said city or town to utilize such periodical in lieu of newspaper advertising for procurements or classes of procurements not to exceed such amount as may be established by the state secretary. Such permission shall remain in effect for a specified period not to exceed three years. In grant-ing, renewing, or revoking such permission, the state secretary shall con-sider whether the periodical provides prospective contractors with reasona-ble notice of contracting opportunities, taking account of such factors as circulation, accessibility, reliability, and cost of the periodical. Such per-mission and any renewal or revocation thereof shall be in writing filed with the city or town clerk, the inspector general, and the state secretary."

[7]We likewise reject the city's contention that the charter is comprehen-sive with regard to procurement such that any additional requirements vio-late the balance established between formality and flexibility. We find nothing in either the letter or spirit of the charter to support such a proposition.

The city also argues that G. L. c. 30B, § 5 (g)'s require-
ment that the lowest bidder be awarded the contract[8] con-
flicts with the city charter, particularly St. 1909, c. 486, § 9.[9]
That provision requires that department heads "be recog-
nized experts in such work as may devolve upon the incum-
bents of said offices, or persons specially fitted by education,
training or experience to perform the same." The city sug-
gests that, by limiting the exercise of discretion by a depart-
ment head, G. L. c. 30B contradicts the quoted portion of the
charter.[10]

Even if we were to accept the dubious proposition that the
sole, or even major reason that the charter requires a depart-
ment head to possess expertise is to make a fine distinction
among responsive bidders beyond price comparisons, we
could not accept the city's reading of the charter provision.
The provision requires only that the department head be ex-
pert "in such work as may devolve upon the incumbents of
said offices." If G. L. c. 30B eliminates a category of work
which may devolve on a department head, it does not thereby
conflict with the charter. When read with the charter provi-
sion, G. L. c. 30B, § 5 (g), merely eliminates an area in
which a department head must be expert.

General Laws c. 30B, § 5, imposes additional requirements
in the procurement of public contracts over $10,000. Those

---

[8]General Laws c. 30B, § 5 (g) (1989 Supp.), provides: "The procure-
ment officer shall award the contract to the lowest responsible and respon-
sive bidder. A contract requiring payment to the governmental body of a
net monetary amount shall be awarded to the highest responsible and re-
sponsive bidder. The procurement officer shall award the contract by writ-
ten notice to the selected bidder within the time for acceptance specified in
the invitation for bids. The parties may extend the time for acceptance by
mutual agreement."

[9]The city also complains of the rigidity and folly of such a requirement.
However, it is within the power of the Legislature to enact laws which may
seem unwise or foolish to some, so long as those laws do not offend the
Constitution of the Commonwealth or of the United States.

[10]The city argues that the present power of the department head to exer-
cise the expertise which the charter requires that they must possess would
be wholly compromised by § 5 in the critical area of procurement of goods
and services.

requirements, however, do not conflict with the city charter. The statutes may be harmonized without doing violence to the letter or spirit of either. Consequently, we are not faced with a conflict between a general law and a special law and need not undertake the task of determining which was intended to control by the Legislature.[11]

2. *Article 89.* Finally, the city argues that G. L. c. 30B cannot apply to Boston regardless of legislative intent because it was not enacted in accordance with art. 89. Article 89, the Home Rule Amendment, restricts the power of the Legislature to legislate with respect to individual cities and towns. Section 8 of the article states: "The general court shall have the power to act in relation to cities and towns, but only by general laws, which apply alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two, and by special laws enacted [pursuant to four conditions]." The city claims that, because c. 30B will have a unique impact on the city of Boston, it is a special law which could only be lawfully enacted in one of the ways prescribed in art. 89.[12] The city's claim of a unique impact by c. 30B

---

[11]The parties argued at considerable length as to whether G. L. c. 30B, § 6, would fundamentally conflict with the city charter. That section provides that some of the inflexibility of § 5 may be mitigated if the municipality has a chief procurement officer. Boston does not have a chief procurement officer and nothing in G. L. c. 30B requires the appointment of such an officer. Because we rule that § 5 does not conflict with the city charter, we need not address the question whether a mandatory § 6 would do so.

[12]Article 89, § 8, first par., states: "The general court shall have the power to act in relation to cities and towns, but only by general laws which apply alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two, and by special laws enacted (1) on petition filed or approved by the voters of a city or town, or the mayor and city council, or other legislative body, of a city, or the town meeting of a town, with respect to a law relating to that city or town; (2) by a two-thirds vote of each branch of the general court following a recommendation by the governor; (3) to erect and constitute metropolitan or regional entities, embracing any two or more cities or towns, or established with other than existing city or town boundaries, for any general or special public purpose or purposes, and to grant to these entities such powers, privileges and immunities as the general court shall deem necessary [or] expedient for the regulation and government thereof; or (4) solely for the incorporation or

rests in large part on the supposed conflict between the char-
ter and the statute. Because we determined that there was no
conflict, the magnitude of any unique impact is not large.
Moreover, the article proscribes the unique *application* of
General Laws on a city or town rather than a unique *impact*
as a result of these laws. A law of general application may
have different effects in different communities. Only when
the law singles out a city or town for special treatment do the
provisions of § 8 of art. 89 apply. See *Belin* v. *Secretary of
the Commonwealth*, 362 Mass. 530 (1972) (law applicable
to each city and town "in which voting by proportional repre-
sentation or preferential voting is in effect" void where Cam-
bridge was the only such municipality in the Common-
wealth). General Laws c. 30B applies alike to all cities and
towns and therefore does not violate art. 89.

3. *Conclusion.* General Laws c. 30B neither irreconcilably
conflicts with the charter of the city of Boston nor violates
art. 89. Thus, it applies to the city of Boston. The entire stat-
ute applies to the exercise of the option at issue in this case,
and the city failed to abide by many of its provisions. The
single justice of the Appeals Court applied the proper stan-
dard for preliminary relief, and properly ordered the city to
conform its conduct to G. L. c. 30B. The single justice shall
remand the case to the Superior Court for further
proceedings.

*So ordered.*

dissolution of cities or towns as corporate entities, alteration of city or
town boundaries, and merger or consolidation of cities and towns, or any of
these matters." It is undisputed that the Legislature followed none of the
four methods laid out above when enacting G. L. c. 30B.